## MURPHEY v. HARRIS.

Under the facts in this case as they appear in the record, the court did not err in granting a nonsuit.

Argued January 19,—Decided August 11, 1909.

Rehearing September 29,—Decided October 2, 1909.

Equitable petition. Before Judge Felton. Bibb superior court. February 3, 1908.

*M. Felton Hatcher* and *Thomas B. West,* for plaintiff, cited, on tender: *Terry* v. *Keim,* 122 *Ga.* 43; *Ansley* v. *Hightower,* 120 *Ga.* 719; *Kerr* v. *Hammond,* 97 *Ga.* 567; *Brown* v. *Askew,* 74

*Ga.* 582.    Statute of frauds; attempt to vary contract by later parol agreement: *Augusta R. ·Co.* v. *Smith,* 106 *Ga.* 684; *Willis* v. *Fields,* 132 *Ga.* 242; *Smith* v. *Ga. R. Co.,* 131 *Ga.* 470; *Corbin* v. *Durdin,* 126 *Ga.* 429; *Tippins* v. *Phillips,* 123 *Ga.* 415; *Oglesby* v. *Williams,* 112 *Ga.* 360; *Douglass* v. *Bunn,* 110 *Ga.* 159; *Jackson* v. *Strowger Ex.,* 108 *Ga.* 646; *Lorillard* v. *Turner,* 100 *Ga.* 645; *Lester* v. *Heidt,* 86 *Ga.* 228.    Contract mutual; specific performance: *Ellis* v. *Bryant,* 120 *Ga.* 890; *Perry* v. *Paschal,* 103 *Ga.* 134; *Reid* v. *Daughtry,* 94 *Ga.* 661; Nelsperger *v.* Meyer, 2 L. R. A. (N. S.) 224.    Agency; party to action: Civil Code, §§2998, 3037 par. 3, 3664, 4939; *Hawkins* v. *Central R. Co.,* 119 *Ga.* 166; *Fargason* v. *Ford,* 119 *Ga.* 343; *Rose* v. *Weinberger,* 108 *Ga.* 536; *Spence* v. *Wilson,* 102 *Ga.* 762; *Buffington* v. *Blackwell,* 51 *Ga.* 129; *Groover* v. *Warfield,* 50 *Ga.* 664; Albany &c. Co. *v.* Lunwerg, 121 U. S. 45; 30 Cyc. 35, 78, 83, 86, 88, and cit.; Dodge *v.* Tulleys, 144 U. S. 451 (36 L. ed. 50).    Recission; novation: Civil Code, §§3077, 3641, 3710-3712, 3732; *Penn. &c. Co.* v. *Thompson,* 130 *Ga.* 766; *Lytle* v. *Scottish &c. Co.,* 122 *Ga.* 466; *Fulghum* v. *Beck &c. Co.,* 121 *Ga.* 273; *Harden* v. *Lang,* 110 *Ga.* 392; *American &c. Co.* v. *Rawlings,* 127 *Ga.* 82; *Hughey* v. *Peacock,* 115 *Ga.* 736; *Wofford* v. *Gaines,* 53 *Ga.* 485; *Lott* v. *Dysart,* 15 *Ga.* 358; *Simms* v. *Lide,* 94 *Ga.* 554; *Fulcher* v. *Daniel,* 80 *Ga.* 74.

   *Charles H. Hall **Jr.** and Miller, Jones & Miller,* for defendant, cited, on rescission and discharge of contract: Civil Code, §§3710, 3732; *Lytle* v. *Scottish &c. Co.,* 122 *Ga.* 458, 466; *Poland Paper Co.* v. *Foote,* 118 *Ga.* 458; *Davis* v. *Morgan,* 117 *Ga.* 504; *Fowler* v. *Coker,* 107 *Ga.* 817; May *v.* Getty, 53 S. E. 75; Taylor *v.* Taylor, 16 S. E. 924; Holden *v.* Purifoy, 12 S. E. 848; Garrell *v.* Alspaugh, 27 S. E. 85; Riley *v.* Jordan, 75 N. C. 180; Dula *v.* Cowles, 75 Am. D. 463; Read *v.* McGrew, 5 Ohio, 375; Guthrie *v.* Thompson, 1 Or. 353; Ballard *v.* Ballard, 25 W. Va. 470; Thompson *v.* Elliot,-28 Ind. 55; Jevne *v.* Osgood, 57 Ill. 340; Davis *v.* Willis, 10 N. Y. Supp. 883; Hammon, Con. §426; Marsh *v.* Despard, 49 S. E. 24; Boggs *v.* Boykin, 9 S. E. 891; Straley *v.* Purvue, 10 S. E. 780; Urpman *v.* Lowther Oil Co., 97 Am. St. R. 1027; Frye, Spec. Per. §§677, 682; Kavelo *v.* Taylor, 63 N. W. 889; Lee *v.* Hawkes, 13 L. R. A. 633; Emerson *v.* Slater, 63 U. S. 22; Monroe *v.* Perkins, 9 Pick. 298; Snow *v.* Ware, 13 Met. 42; Vicary *v.* Moore, 2 Watts, 451; Cummins *v.* Arnold, 3 Met. 489; Fleming *v.* Gilbert, 3 Johns.

528; Goucher *v.* Martin, 9 Watts, 106; Murray *v.* Harway, 56 N. Y. 337; Babcock *v.* Huntington, 9 Ala. 441; Lauer *v.* Lee, 42 Pa. 65; Warv. Vend. (2d ed.) §§218, 226, 826.   Agency: Tiffany, Ag. 134, 136, 137; Story Ag. (6th ed.) §499; 31 Cyc. 1310; 1 Am. & Eng. Enc. L. 444; *Ray* v. *Hemphill,* 97 *Ga.* 567.

BECK, J.   J. Clay Murphey brought suit against E. B. Harris to enforce specific performance of an alleged contract for the sale of a lot and storehouse in Macon, Georgia.   The petition set forth the contract sued upon, which is in writing and reads as follows:

"250.00                                "Macon, Ga., Oct. 13, 1906.

"Received of J. Clay Murphey, Agent, two hundred fifty dollars ($250.00) part payment of purchase-price of property known as the E. B. Harris store in the City of Macon, located on the S. E. corner of Third and Cherry Sts.   The same being the two-story brick building now occupied by me.   It is understood that this is to be part of the purchase-price of said property, which is sold by me for the sum of thirty-six thousand dollars ($36,000.00).   It is further understood that the title to the said property is to be examined and found perfect by purchaser before payment, examination to proceed at once, and payment made immediately upon acceptance.

"In witness whereof I hereunto set my hand and seal, this 13th day of October, 1906.                [Signed] E. B. Harris."

During the negotiations leading up to the payment of the $250 and the taking of the above receipt, Murphey, who is a real-estate agent, represented to Harris that he was acting for a customer by the name of Henry, a traveling salesman for a New York house. About a month later Henry came to Macon, and on meeting Harris stated to him that he was unable to carry out the trade, having invested his money in New York, and asked Harris to release him from the contract.   This Harris refused to do.   Henry offered to pay $5,000 in cash and the balance in thirty days, which Harris finally agreed to, but this agreement between them was not reduced to writing.   On leaving Macon Henry drew a check for $5,000, which he left with Murphey.   Murphey proceeded to have a bond for title drawn up and presented it to Harris to sign, tendering at the same time $5,000.   The obligee named in the bond for title was one Neel, Murphey informing Harris at that time that Henry had sold his interest in the property through him to Neel. Harris declined to execute the bond for title.   Murphey then ten-

dered to Harris the full amount of the purchase-price, less the $250 paid on October 13th, as stated in the foregoing receipt.

The facts above stated appear from the evidence introduced by plaintiff at the trial. No evidence was offered by the defendant. Upon motion of the defendant, the court awarded a nonsuit.

A decision of this case having been made and a rehearing granted, after reargument and reconsideration we have reached the same conclusion which we arrived at originally; but the original opinion filed by the court has been withdrawn, and the following has been substituted in lieu thereof.

It will be observed that the receipt was given in this case to "J. Clay Murphey, Agent," for $250, part purchase-price of certain real estate in Macon. It stated that "It is understood that this is to be part of the purchase-price of said property, which is sold by me for the sum of thirty-six thousand dollars ($36,000.00). It is further understood that the title to the said property is to be examined and found perfect by purchaser before payment, examination to proceed at once and payment made immediately upon acceptance." This was very vague and indefinite on its face. It did not in terms designate Murphey as the purchaser or distinctly agree to make title to him, or that he was the person to examine the title and pay the balance of the purchase-price upon satisfaction. The use of the word "Agent" after the name of Murphey, coupled with the omissions above indicated, and the use of the words, "to be examined and found perfect by purchaser before payment," are not clear and explicit expressions to indicate a certain intention to sell the lot to Murphey and to have him satisfied with the title and thereupon pay the purchase-price and be entitled to have a conveyance made to him personally. If the contract should be held to have that effect, it would rather be by construction as a whole than because of direct and positive terms. How did the parties concerned in the transaction deal with this trade, and whom did they treat as being the real contracting parties, bound on the one side, and entitled to enforce the contract on the other, as disclosed by the evidence introduced by the plaintiff? The writing did not on its face disclose the name of the principal, but throughout the negotiations Murphey purported to be acting, not for himself, but as agent for another (Henry). He did not proceed with the examination of the title, or claim to be authorized to act except under

the instructions and direction of Henry. He testified that he told Harris that he would like for the latter to let him know in four or five days if the trade would be closed for $36,000, "as I only had his [Henry's] route for five days, he being a traveling man; and Harris came to my office on Friday, October 12th, and I showed him the letter authorizing me to buy it for $36,000. . . I gave Mr. Harris $250 in cash, and he signed that receipt, and he says, 'Get in communication with Henry and have him come to Macon,' and I telegraphed Henry, and it didn't reach him on account of Harris delaying his answer until Henry left the point that I had. . . And when Henry telegraphed us he said he would be delayed, and came here November 9th, and Harris was kept posted in regard to Henry's delay." When Henry reached Macon Murphey notified Harris, and the latter and Henry, together with one Marshall (a friend of Henry) and Murphey, met in Murphey's office. Henry and Harris entered into a conversation in regard to the transaction, treating it not as Murphey's trade but as Henry's; and Murphey, though present, also acquiesced in this proceeding. Henry asked Harris to let him out of the trade, as he had made some investments and it would be inconvenient to get $36,000 in cash, and as he did not get the telegram until after he had left New York. Harris said, "Well, I can not let you out of it. I am like you; I have made obligations; I have contracted some obligations for some timber interests, thinking about going into the business, and I can not let you out of the trade; otherwise I would be glad to do so, because I think it is worth $40,000." Henry replied, "I am sorry you take this view. I thought you would let me out. I can not pay you but $5,000 in cash and give you $31,000 in thirty days." Harris did not express assent to this at the time, but on the next morning he and Henry again went to the office of Murphey and stated that Harris had agreed to accept the terms offered, and Henry also stated that he had agreed to let Harris stay in the corner store at a rent of $250 per month until the first of the following January, if Harris so desired. He also referred to what improvements he intended to make on the building, and Harris said he was not sure he would stay in the building. Henry wrote a check for $5,000, and left it in possession of Murphey. A bond for title was drawn by Murphey and West, an attorney. There was some discussion between Murphey and Harris as to in-

terest and also as to the lease of a part of the store being inserted in the bond. Harris suggested to Murphey to write a letter to Henry on the subject, which Murphey did, receiving a letter and telegram from Henry, giving him instructions. In the bond for title which was drawn the name of neither Murphey nor Henry was inserted as the obligee, but the name of one Neel. This was done, as Murphey testified, "because he had bought through me from Henry this property, and West and myself inserted his name. We didn't think it was necessary to send Henry a deed, let Harris sign a deed to Henry and then let Henry send it back to Neel, and Harris says, 'I will think this over and let you know.' That was the first time he knew of Neel coming in there." On the next day Murphey and Marshall went to see Harris, procured $5,000 in cash from the bank and tendered it to Harris and requested him to sign the bond for title and "carry out your contract." Harris declined to sign the bond or to specify his reasons for refusing. He inquired of Murphey how much money was tendered; and on being informed that the tender was of $5,000, he remarked that Murphey did not have $36,000. The latter replied that he did not, but would tender the whole $36,000; and thereupon Harris stated that he did not want the tender and did not want to carry out the contract. Murphey saw Neel, and together they made arrangements at the bank to get $36,000, and asked Harris if he would sign the contract on the payment of that amount in cash, to which he replied that he would not do so. There was other evidence tending to show an admission of the tender of the full amount. In the pleadings of the plaintiff it was stated that the tender was of the balance of the purchase-price in addition to the original payment of $250, to wit: $35,750. The $250 was never returned. It was Henry's money. In answer to an inquiry, "It was intended for Henry and not for yourself?" Murphey said, "Yes, sir." When asked, "It was not your money or intended to be your money, or tendered for yourself?" he answered, "Not at that time; no, sir." It will thus be seen, that, according to the evidence introduced by the plaintiff himself, none of the parties treated the contract as his individually. He would not proceed at all except upon instructions by and notification to Henry. He required the latter to come to Macon, and the entire matter was turned over to the two principals, who proceeded to negotiate in regard to it and to

24

make terms with each other, entirely independent of Murphey. He recognized their right to do so, and later recognized the new agreement as the one which was subsisting, because he first tendered $5,000 and demanded the signing of a bond for title, not to himself as obligee, but to a person who he claimed was a purchaser from Henry through him as agent, namely, Neel. Harris had not contracted to make any bond for title to Neel. When later the entire balance of the purchase-money was tendered, it was apparently Neel's money. At last Neel and Murphey together raised the money from bank, made a tender, and asked if he would sign the contract on the payment of the $36,000 in cash. The pleading of the statute of frauds is not compulsory, but permissive. Harris has not pleaded it, nor does it anywhere appear from the evidence that in the progress of the negotiations he has raised any question on that ground. Murphey in the present proceeding is undertaking to enforce in his own name the preliminary agreement, disregarding altogether the transaction between the two principals which followed the preliminary receipt. Having turned over the negotiation to the principals, and neither one of them having raised the question of the statute of frauds, and having himself proceeded to make a tender in accordance with what he recognized as the new agreement between the two principals, it would scarcely seem to lie in his mouth to now say that all of this amounted to nothing, and that he could return to the original status, claim to be himself the principal in the contract, and have specific performance decreed in his favor and a conveyance made to him. In the brief of counsel for plaintiff in error it is contended that Murphey was suing for the use of his principal; but nothing in his pleadings so indicated, and the prayer was that "Harris be required to make to petitioner a full, complete, and marketable title to said property." Moreover the $250 originally paid was shown to have been paid for, and to have been the money of, Henry. He also left a check for $5,000 with Murphey, and it may be fairly inferred that the tender of that amount which was made was with the proceeds of this check or funds standing in lieu of it. If the property was sold to Neel as the property of Henry, the proceeds of that sale also would belong to Henry. Thus the plaintiff stands with a preliminary payment made with the money of Henry, with a modification or new agreement made by the principals and

recognized by him, with a tender of at least a part of the balance of the purchase-price apparently arising from the funds or rights or credits of the principal, and yet seeking to have specific performance, not of the contract which the principal agreed that he would carry out, but of the original agreement which was the one the principal had announced that he could not adhere to. In one part of his testimony, in answer to the question, "Were you ready and willing yourself to carry out the contract?" Murphey replied, "I was, individually." He also stated that he was ready and willing to carry it out, and was able and had made arrangements to do so. When asked, "Without regard to any one else?" he answered, "Yes, without regard to Henry or Neel, I made arrangements with other parties, and individually." If by this testimony he meant that he individually intended to take over the contract without regard to his principal, to receive the benefit of the $250 which had been originally paid, to repudiate all that his principal had done thereafter, and to have a decree that title be conveyed to him individually, it can hardly be seriously contended that this could be done. He is invoking the equitable powers of a court of conscience to obtain specific performance; and under the evidence introduced by him, we think he failed to make out a prima facie case entitling him to the decree prayed by his pleadings. The grant of the nonsuit was therefore proper.

Under the ruling above made, it becomes immaterial to discuss the questions raised on the pleadings. Had these rulings been made as the plaintiff contends they should have been, and had evidence been allowed in support of the rejected amendments, the result could not have been different.

*Judgment affirmed. All the Justices concur.*